Receipt #0066615

ORIGINAL

FILED
JUN - 5 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PACIFIC GAS AND ELECTRIC COMPANY,

v.

UNITED STATES.

No. 07-352 C

## COMPLAINT

Plaintiff, Pacific Gas and Electric Company ("PG&E"), alleges as follows:

## SUMMARY OF PG&E'S CLAIMS

1. This is a breach of contract action for damages against the United States. The Western Area Power Administration ("WAPA") is a federal entity. By taking service under a PG&E tariff approved by the Federal Energy Regulatory Commission ("FERC"), WAPA agreed to reimburse PG&E for Grid Management Charges ("GMCs") paid by PG&E on WAPA's behalf to the California Independent System Operator Corporation ("CAISO"). PG&E incurred charges for services performed on WAPA's behalf, and paid the CAISO invoices for services performed on WAPA's behalf. WAPA accepted those services, and paid PG&E's invoices for those services until March 2003, when it abruptly stopped paying. This suit for breach of contract seeks the remaining unpaid balance for services PG&E performed on WAPA's behalf.

2. GMCs are imposed by the CAISO on all entities that use the electric transmission system operationally controlled by the CAISO. The GMCs cover the CAISO's administrative and overhead costs in acting as the Independent System Operator in California. The CAISO imposes GMCs on all Scheduling Coordinators ("SCs") who schedule transactions using facilities that are part of the CAISO Controlled Grid. PG&E was an SC authorized to schedule transactions.

3. FERC approved PG&E's GMC Pass Through Tariff ("PTT"), allowing PG&E to pass through, on a dollar-for-dollar basis, GMCs incurred to schedule transactions on behalf of customers for whom PG&E acted as a Scheduling Coordinator.

4. At all relevant times, WAPA used the CAISO-controlled grid for some of its transactions and, by using PG&E as its SC for those transactions, took service under PG&E's GMC PTT.

5. For the period January 2001 through December 2004, the total GMC allocated to WAPA under PG&E's GMC PTT amounted to $13,786,917.74. In recognition of its contractual obligation to pay PG&E for services under the GMC PTT, between October 2001 and March 2003, WAPA paid $8,297,037.03 in GMC to PG&E. This action seeks the remaining unpaid balance of GMCs for the period January 2001 through December 2004. That remaining unpaid balance is $5,489,880.71, exclusive of interest.

6. PG&E's provision of services to WAPA, WAPA's acceptance of those services, and WAPA's partial payment for those services, evidence a meeting of the minds establishing an implied-in-fact contract obligating WAPA to pay for services provided by PG&E.

7. PG&E is entitled to payment from WAPA of the outstanding $5,489,880.71, plus interest, in fulfillment of WAPA's contractual obligations.

**PARTIES**

8. PG&E is a corporation formed under the laws of the State of California with its principal place of business in San Francisco, California. PG&E is engaged in the purchase, transmission, distribution, and sale of electric power to the public within the State of California.

9. WAPA is an agency of the United States Department of Energy. WAPA markets and delivers power from 57 hydroelectric power plants located within a 15-state region of the

central and western United States. WAPA sells power to wholesale customers, including municipalities, cooperatives, public utilities, irrigation districts, federal and state agencies, investor owned utilities, and United States Bureau of Reclamation customers.

## JURISDICTION

10. This Court has jurisdiction over this action pursuant to 41 U.S.C. § 609(a)(1) and 28 U.S.C. § 1491(a).

## FACTUAL ALLEGATIONS

### The CAISO Market

11. The CAISO is a non-profit, public benefit corporation organized under California law responsible for managing the flow of electricity across the electric transmission facilities turned over to its operational control on a non-discriminatory, open access basis.

12. GMCs are imposed by the CAISO on all entities that use the electric transmission system operationally controlled by the CAISO. GMCs cover the CAISO's administrative and overhead costs in acting as the Independent System Operator. FERC permits recovery of GMCs by the CAISO from entities that use the electric transmission system operationally controlled by the CAISO. The CAISO charges GMCs to SCs who schedule transactions using facilities that are part of the CAISO-controlled grid.

13. PG&E has been and remains a CAISO-certified SC authorized to submit schedules for the transmission, purchase and sale of electricity and ancillary services through the CAISO's markets.

14. This breach of contract action stems from the scheduling services PG&E performed for WAPA from 2001 through 2004. PG&E incurred charges from the CAISO for

performing SC services on WAPA's behalf. PG&E has paid CAISO invoices for GMCs incurred on WAPA's behalf.

**The CAISO's Grid Management Charge and PG&E's Pass-Through Tariff**

15. The CAISO originally proposed a GMC in a filing with FERC on October 17, 1997. The original GMC filed with FERC was a bundled formula rate.

16. PG&E made a filing with FERC on October 31, 1997 proposing a formula rate to pass-through the CAISO's proposed GMC to certain of PG&E's wholesale contract customers with existing transmission contracts, including WAPA.

17. The CAISO's original GMC filing and PG&E's original GMC PTT filing resulted in an uncontested offer of settlement ("April 1998 Settlement") which was filed at the FERC on April 7, 1998.

18. On November 1, 2000, as amended on December 15, 2000, the CAISO submitted an unbundled GMC proposal to FERC. The CAISO's unbundled GMC proposal separated its costs into three categories: Control Area Service ("CAS") costs, which included the CAISO's costs as Control Area Operator associated with ensuring the safe and reliable operation of the transmission grid and the entire Control Area; Inter-Zonal Scheduling ("IZS"), which included the CAISO's costs of administering congestion management, and the auction, monitoring and secondary market monitoring and scheduling of firm transmission rights; and Market Operations ("MO") which included the CAISO's costs of market and settlement services.

19. On November 13, 2000, as amended on December 26, 2000, PG&E submitted to FERC for filing a proposed GMC PTT, intended to allow PG&E to recover from its Control Area Agreement ("CAA") customers, any GMC charged by the CAISO after January 1, 2001 under the newly-proposed three category methodology. PG&E's GMC PTT applied to those

existing wholesale CAA customers for which PG&E served as an SC. WAPA was included in the list of CAA Customers contained in Appendix A to FERC Electric Tariff Original Volume No. 11. PG&E's GMC PTT, as filed with FERC on November 13 and December 26, 2000, is attached to this Complaint as Exhibit 1.

20. As stated in PG&E's GMC PTT filing, "the service being charged for under the GMC Pass-Through Tariff is a new service and not an amendment to any existing CAA. . . . PG&E's function as an SC, either directly or through another SC, for CAA customers constitutes the provision of a new service."

21. The FERC presiding judge conducted a hearing in the proceedings from November 13, 2001 through December 20, 2001. WAPA intervened in the FERC proceeding and was an active participant. WAPA sponsored testimony, responded to discovery requests, filed a Motion for Partial Summary Disposition, participated in FERC hearings, and filed several briefs.

22. On May 2, 2003, FERC issued Opinion No. 463. With respect to PG&E's GMC PTT, FERC determined that acting as an SC for the CAA customers constituted a "new service" that PG&E was not already obligated to perform pursuant to the existing CAA contracts with wholesale customers. Rather, "these customers of PG&E are receiving a new and different service in addition to the service they already receive under the CAAs, and the rate at issue here is the pass-through of the costs to PG&E billed by the ISO for these services."

23. FERC approved PG&E's GMC PTT and determined that it was entitled to recover from its CAA customers all components of the GMC.

24. On October 31, 2003, the CAISO submitted to FERC revisions to its GMC charge, to become effective in 2004. ("2004 GMC case"). The CAISO proposed to further expand the GMC from three categories to seven.

25. On November 28, 2003, PG&E submitted to FERC revisions to its GMC PTT ("2004 GMC PTT case"). PG&E's filing sought to align PG&E's GMC PTT with the proposed rate structure in the CAISO's 2004 GMC case.

26. On July 29, 2004, the CAISO and PG&E submitted to FERC an uncontested Offer of Partial Settlement that resolved all issues with respect to the 2004 GMC case and PG&E's 2004 GMC PTT case, with the exception of one issue not relevant to this Complaint.

27. On February 2, 2005, FERC approved the uncontested Offer of Partial Settlement.

**The Parties' Performance**

28. During the period January 2001 through December 31, 2004, PG&E paid GMC to the CAISO for loads for which PG&E acted as the SC for WAPA.

29. Between October 2001 and March 2003, WAPA paid PG&E GMC charges totaling $8,297,037.32 for SC services PG&E performed on WAPA's behalf for the period of January 1, 2001 through October 31, 2002.

30. On March 12, 2003, PG&E invoiced WAPA for GMC charges for the November 2002 service month in the amount of $286,318.15. WAPA refused to pay the March 12, 2003 invoice.

31. WAPA has not paid any GMC charges to PG&E since March 2003.

32. On November 19, 2004, PG&E sent a letter to WAPA initiating the dispute resolution procedures of Section 11.1 of PG&E's GMC PTT, noting that WAPA's refusal to pay

its GMC from November 2002 to December 2003 is contrary to the explicit requirements of PG&E's GMC PTT in effect from January 1, 2001 to December 31, 2003.

33. WAPA did not pay the outstanding balance.

34. On February 14, 2006, PG&E sent a letter to WAPA notifying it that, pursuant to Section 6.4 of the GMC PTT, if payment of WAPA's balance was not received within thirty (30) days, WAPA would be in default. WAPA did not pay the outstanding balance.

**Compliance with the Contract Disputes Act's Claim Presentment Requirement**

35. On April 11, 2006, PG&E complied with the claim presentment requirements of the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, by serving a written claim on WAPA and certifying that the claim was made in good faith, that the supporting data were accurate and complete to the best of PG&E's knowledge and belief, and that the amount requested accurately reflected the contract adjustment for which PG&E believed the Government was liable. *Id.* at § 605(c)(1).

36. WAPA denied PG&E's claim on June 12, 2006. WAPA's denial letter states that, "[t]his letter constitutes a final agency action."

## FIRST CLAIM FOR RELIEF

### Breach of Implied-In-Fact Contract

37. PG&E incorporates by reference the allegations set forth in paragraphs 1-36 herein.

38. From 2001 through 2004, PG&E performed Scheduling Coordinator services for WAPA, and incurred GMCs from the CAISO attributable to WAPA's use of the CAISO-controlled grid in the amount of $13,786,917.74 for those services.

39. PG&E paid GMCs to the CAISO for loads scheduled on WAPA's behalf.

40. WAPA willingly accepted the SC services PG&E performed, and indicated its intention to pay for those services, consistent with the FERC-approved tariffs.

41. The parties' conduct described above demonstrates a "meeting of the minds" and an implied agreement that WAPA would pay PG&E for SC services rendered under the GMC PTT.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

42. PG&E incorporates by reference the allegations set forth in paragraphs 1-41 herein.

43. In Opinion No. 463, FERC approved PG&E's GMC PTT as just and reasonable under Section 205 of the Federal Power Act.

44. The GMC PTT, by virtue of its acceptance as just and reasonable by FERC, operates as a contract between PG&E and WAPA, an entity that took service under the GMC PTT.

45. At all relevant times, WAPA was taking service under PG&E's GMC PTT, and PG&E incurred GMC costs for loads scheduled on WAPA's behalf.

46. PG&E paid to the CAISO GMC for loads scheduled on WAPA's behalf.

47. PG&E's GMC PTT allows PG&E to pass through GMCs it pays to the CAISO to CAA customers, on a dollar-for-dollar basis.

48. By failing to pay for services rendered by PG&E pursuant to the GMC PTT, WAPA has breached its obligations under the contract.

**PRAYER FOR RELIEF**

WHEREFORE, PG&E prays for relief against WAPA as follows:

1. For judgment against WAPA for unpaid GMC PTT charges for the period January 2001 through December 2004, in the amount of $5,489,880.71.

2. For an award of pre-judgment and post-judgment interest;

3. For recoverable costs of suit and other expenses;

4. For such other relief as the Court may deem just and proper.

Respectfully submitted,

DATED: June 4, 2007

Kerry C. Klein

Kerry C. Klein
77 Beale Street, B30A
Post Office Box 7442
San Francisco, CA 94120
Telephone: (415) 973-3251
Facsimile: (415) 973-5520
Attorney for Plaintiff
PACIFIC GAS AND ELECTRIC
COMPANY

Of Counsel:

Mark D. Patrizio
PACIFIC GAS AND ELECTRIC COMPANY

Robert L. Shapiro
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
Telephone (202) 331-3174
Facsimile: (202) 261-4752

**Exhibit 1**

ORIGINAL

FILING WITH THE FEDERAL ENERGY REGULATORY COMMISSION

ER01-424-000

# PACIFIC GAS AND ELECTRIC COMPANY

## GRID MANAGEMENT CHARGE PASS-THROUGH TARIFF

FILED
OFFICE OF THE SECRETARY
00 NOV 13 PM 1:50
FEDERAL ENERGY
REGULATORY COMMISSION

November 9, 2000

FERC DOCKET NO. ____________

Disk/OSEC 0011160253-3

FERC DOCKETED
NOV 13 2000

ORIGINAL

**Pacific Gas and Electric Company**

*MAILING ADDRESS*
P.O. Box 7442
San Francisco, CA 94120
*STREET/COURIER ADDRESS*
Law Department
77 Beale Street, B30A
San Francisco, CA 94105
415/972-5646
Fax 415/973-5520

Keith T. Sampson
Attorney at Law

FILED
OFFICE OF THE SECRETARY
00 NOV 13 PM 1:08
FEDERAL ENERGY
REGULATORY COMMISSION

PG&E

November 9, 2000

Mr. David P. Boergers, Secretary
Federal Energy Regulatory Commission
Mail Code: DPR, HO-20.3
888 First Street, N.E., Room 1A
Washington, DC 20426

ER01-424-000

Re: Pacific Gas and Electric Company's GMC Pass-Through Tariff,
FERC Docket No. ER01-______-000

Dear Mr. Boergers:

In its November 1, 2000 filing in FERC Docket No. ER01-313-000, the California Independent System Operator Corporation ("ISO") proposes to make several changes to how it charges market participants for the costs included in the ISO's Grid Management Charge ("GMC"). The currently-effective GMC charge was the product of a negotiated Settlement which terminates on December 31, 2000. The ISO's filing seeks to impose the GMC on all loads in its Control Area, including loads associated with transactions that do not flow on the ISO controlled grid. PG&E is making this filing to be assured of having the ability to pass-through to its customers whatever GMCs are accepted and approved by the Commission. [1]

Enclosed are an original and six copies of PG&E's Grid Management Charge Pass-Through Tariff ("GMC Pass-Through Tariff") which PG&E is filing pursuant to Section 205 of the Federal Power Act ("FPA"). This GMC Pass-Through Tariff seeks only to collect the actual GMC charges billed by the ISO for Scheduling Coordinator ("SC") services for certain customers which have existing wholesale contracts ("Control Area Agreement" or "CAA"). PG&E's new GMC Pass-Through Tariff replaces PG&E's present GMC Pass-Through Tariff which expires December 31, 2000.

## 1. BACKGROUND

Since the ISO began commercial operations on April 1, 1998, the ISO has recovered its administrative and operating costs through the GMC, which it has billed to SCs, including PG&E. As soon as PG&E recognized that it was going to be receiving charges from the ISO in connection with contracts that pre-dated the creation of the ISO, PG&E

---

[1] PG&E believes it would be appropriate for the Commission to consolidate this filing with the ISO's filing in FERC Docket No. ER01-313-000.

filed with this Commission for authority to pass those charges through to the entities on whose behalf PG&E incurred those charges, including wholesale customers. Specifically, when the ISO filed its original GMC Tariff in FERC Docket No. ER98-211-000, PG&E responded by filing for the initial pass-through of those costs in its GMC Pass-Through Tariff in FERC Docket No. ER98-556-000. PG&E's filing was consolidated with FERC Docket No. ER98-211-000, and other dockets, and was accepted and set for hearing.

Before the propriety of the ISO's GMC charges or PG&E's ability to pass those charges on to its wholesale contract customers could be decided by this Commission, the parties reached a Settlement Agreement ("Settlement"). Among other things, the non-precedential Settlement provided for a specific GMC amount and provided that PG&E's wholesale customers would pay either no GMC or only 50% of the otherwise applicable charges based on their actual volumes. The Settlement was filed on April 7, 1998 and accepted by FERC on June 1, 1998. The Settlement was originally only to be effective through December 31, 1998. The Commission subsequently extended the term of the Settlement through December 31, 2000.

## 2. REASON FOR FILING PG&E'S GMC PASS-THROUGH TARIFF

PG&E's reason for making this filing is simple. Beginning on January 1, 2001, the ISO proposes new charges for recovery of its GMC and proposes to make those charges in ways that are different than what has been in place as a result of the Settlement. Specifically, the ISO proposes to unbundled its GMC into three separate service categories: Control Area Services/Scheduling; Inter-Zonal Scheduling; and Market Operations/Billing & Settlements. In light of the expiration of the Settlement as of December 31, 2000, PG&E's GMC Pass-Through filing is necessary for PG&E to be able to recover 100% of the GMC as billed to PG&E.

## 3. CUSTOMERS AFFECTED BY THE GMC PASS-THROUGH TARIFF

PG&E's new GMC Pass-Through Tariff applies to those existing wholesale CAA customers for which PG&E now serves as an SC, and to the CAA customer for which PG&E has designated another SC such as the California Power Exchange Corporation ("PX"), whereby the designated SCs incur charges from the ISO and passes those charges on to PG&E.

## 4. THE IMPORTANCE OF FULL RECOVERY

### a. Policy Signal to the Industry

PG&E's ability to recover whatever GMCs it incurs on behalf of its CAA customers is not only the equitable result, it is important from an electric industry restructuring policy perspective. The industry needs to have confidence that utilities that join an ISO will fully

recover the associated costs. In this case, the associated costs are those that result from PG&E's taking on a new obligation to act as an SC, or designating an SC for its CAA customers, in order to ensure that its CAA customers have access to the ISO Control Area services. Given that the ISO GMCs billed to PG&E will be Commission-approved charges, there should be no question that the costs of these new services should be borne by the CAA customers rather than by PG&E. If PG&E's pass through of these new charges is denied, it will send the wrong message to the electric industry that some parties may be penalized, and incur unrecoverable costs, if they join an ISO or Regional Transmission Organization ("RTO").

In this filing, PG&E is proposing a new GMC Pass-Through Tariff to be effective January 1, 2001. PG&E believes that the services being provided by the ISO which give rise to the GMC were never contemplated by and are not provided under the CAAs. As discussed below, the service being charged for under the GMC Pass-Through Tariff is a new service and not an amendment to any existing CAA. Treating PG&E's GMC Pass-Through Tariff as a new service is the appropriate thing to do both factually and from a broader policy perspective.

The fundamental policy question is who should bear the cost of creating, maintaining and sustaining the entity that assumes the responsibility for and performs the tasks required to operate the Control Area for an RTO. In each region, there will be an unavoidable tension among protecting the contractual rights of the existing contract customers, adopting policies that treat all customers on a nondiscriminatory basis, and ensuring that transmission providers will fully recover the costs associated with joining the RTO. In many cases, parties will be asked to undertake obligations that are in addition to those set forth in existing contracts and those additional obligations may bring with them additional costs. In such circumstances, there must be a sound policy basis for permitting the effected party to recover any costs incurred under a new tariff. Such an approach would not only be consistent with the fact that new services are being provided; it would avoid unproductive litigation over whether the existing contracts permit a unilateral rate filing to reflect a fundamental change in regulatory landscape that neither party could have foreseen. As a policy matter, neither party should be held to have foreseen, in negotiating their pre-ISO RTO contracts, the dramatic restructuring that is taking place today, and in particular the federal policy in favor of utilities' relinquishing control of their transmission facilities, and the provision of all control area related services by an ISO/RTO.

**b. Level of Utility's Control**

PG&E has no control over the costs that make up the new unbundled ISO GMC. While PG&E was one of the participants in the ISO's stakeholder process, the costs, the boundaries of the three "buckets" constituting the total GMC, the development of the billing determinants, and the resulting rates were ultimately decided by the ISO based on the input of many stakeholders. This filing asks only that PG&E be authorized to pass-through to its CAA customers, on a dollar-for-dollar basis, any GMCs that it is charged by the ISO after January 1, 2001, under terms approved by the Commission.

### c. Customers' Options and PG&E's Voluntary Role

It is important to note that the role of an SC is not a function that PG&E is obligated to perform on behalf of its CAA customers. However, incurring the ISO's GMC charge is an unavoidable companion burden that all SCs must accept. Under Commission approved ISO rules (ISO Tariff § 2.2.3), PG&E's CAA customers could not gain access to the ISO controlled grid without an SC. As a result, in order to streamline the transition to the new ISO structure and to accommodate the needs of the CAA customers for access, even though the service was not contemplated under the CAAs themselves, PG&E voluntarily undertook the role of SC for most of the CAA customers and agreed to schedule the needs of another CAA customer through the PX.

To memorialize this role, PG&E executed the Responsible Participating Transmission Owner Agreement ("RPTO Agreement") with the ISO. The RPTO Agreement provides that PG&E will be the SC or will designate an SC responsible for scheduling for the CAA customers. As a result, PG&E assumed all the duties and responsibilities of an SC, including the obligation to pay the ISO GMC associated with the volumes for those customers. This filing simply asks that these customers reimburse PG&E for the actual costs PG&E will incur on their behalf. PG&E is not asking for any reimbursement for the costs it incurs internally in performing these services. PG&E simply wants to be able to pass through the GMCs it receives from the ISO.[2]

## 5. LEGAL BASIS FOR RECOVERY OF GMC PASS-THROUGH TARIFF COSTS

### a. The GMC Pass-Through Tariff Represents Cost Recovery for a New Service

PG&E's function as an SC, either directly or through another SC, for CAA customers constitutes the provision of a new service. This new service comes about in a newly restructured industry and triggers a completely new charge. The range of new functions includes preparing and submitting balanced schedules, procuring ancillary services and transmission losses under ISO Tariff, rules and protocols, paying new charges required by the ISO to schedule on the grid (*e.g.*, neutrality and unaccounted for energy), and buying and selling energy in the ISO imbalance market for over and under-deliveries. It is clear that these are functions that were not previously performed or provided, and that greater customer benefits are provided.

---

[2] PG&E has reserved the right under the RPTO Agreement to cease providing SC services to the CAA customers upon 20 days' notice. RPTO Agreement §§ 2.3, 2.6. Similarly, if the customers do not wish to pay GMC Pass-Through Tariff rates, they remain free to act as their own SC or designate another SC. RPTO Agreement § 2.3. Consequently, the GMC Pass-Through Tariff applies to each customer only until that customer selects another SC or PG&E provides notice that it will no longer act as SC for the CAA customer. PG&E is not contractually required to continue to perform these services.

**b. The Service is in Association with Control Area Operation**

Although charges associated with the ISO's operations have been processed since the commencement of the ISO's commercial operations in April 1998, those charges were collected pursuant to a Settlement which, by its express terms, did not establish any precedent as to future collection or applicability. As a result, while the subset of CAA customers that paid a portion of the GMC under the terms of the Settlement is different than the CAA customers to whom PG&E now proposes to pass through these GMCs, a review of the list of services covered by the GMC described in the preceding paragraph reveals that the services are clearly and unmistakably related to the ISO's new role in managing and operating the control area. As described and charged for by the ISO, it is clear that the services for which the GMC is charged are related to volumes within the ISO Control Area and not just to volumes on the ISO controlled grid.

**c. The GMC Pass-Through Tariff Represents Only a One for One Pass-Through**

PG&E's filing requests only a dollar for dollar pass through. This new GMC Pass-Through tariff seeks to recover from the CAA customers only the costs of the services provided by the ISO and only the costs approved for recovery by FERC through the GMC. The CAA customers are the direct beneficiaries of these ISO services and, therefore, it is appropriate that they be charged for those services. PG&E does not seek to earn a return on the pass-through, but rather seeks to recover only the full cost billed to it by the ISO for the CAA customers.

**d. FERC Precedent Regarding Treatment of New Services in Existing Contracts**

The GMC Pass-Through Tariff represents a new service for CAA customers under established FERC precedent and broader policy objectives associated with electric restructuring (as discussed, *supra*). The GMC Pass-Through Tariff satisfies the rule that, unless a service is specifically prescribed in an existing contract, a public utility is not constrained by that contract from collecting the costs of any other service provided to that customer. "Contracts should be explicit as to the service provided. We will not infer an obligation to provide a service that is not explicitly required." *Wisconsin Elec. Power Co.*, 46 FERC ¶ 61,019, at 61,111 n.7, *reh'g denied*, 48 FERC ¶ 61,247 (1989). A customer "is only given the right to receive the service which the contract provides." *Id.* For example, a contract providing firm transmission service does not, unless specifically stated in the contract, grant the customer nonfirm service rights, *id.*, nor does it grant the customer the right to back-up transmission service. *See Florida Power & Light Co.*, 62 FERC ¶ 61,251 (1993), *reh'g denied*, 65 FERC ¶ 61,411, at 63,128 (1993) (treating filing as a new service and declining "to set for hearing whether or not the existing contracts already provide for the [transmission] line backup services"). In this case, for all the reasons stated above, PG&E's GMC Pass-Through Tariff clearly seeks recovery of costs for a service that is fundamentally different than that provided

under the existing CAA and, in any event, is not a service required by those agreements.

### e. Consistent with Treatment in Other Pass-Through Filings

In this filing, PG&E is treating this new service of the ISO under the GMC in the same manner as in PG&E's Scheduling Coordinator Services Tariff, FERC Docket No. ER00-565-000, and the Reliability Services Tariff, FERC Docket No. ER00-2360-000. In both cases, the Commission accepted those filings, and set them for hearing.

## 6. IN THE ALTERNATIVE, THE GMC PASS-THROUGH TARIFF SHOULD BE ACCEPTED AS AN AMENDMENT TO THE EXISTING CAAS

Alternatively, if the Commission finds that the GMC Pass-Through Tariff does not constitute a new service, it should be approved as an amendment to the existing CAAs for which PG&E serves as SC or for which PG&E has designated an SC (in the RPTO Agreement).

Each existing CAA to which this Tariff applies contains a provision granting PG&E the unilateral right to file for rate changes under FPA Section 205. Although one, PG&E Rate Schedule FERC No. 79 with the Western Area Power Authority (Western), contains a rate lock that is in effect until April 1, 2001.

## 7. DESCRIPTION OF PROPOSED RATES

This GMC Pass-Through Tariff is requested to recover from the CAA customers only the costs of the services provided by the ISO and only the costs approved for recovery by FERC through the ISO's GMC. PG&E's pass-through in this Tariff merely reflects the charges, services, and rates billed to PG&E in its role on behalf of the CAA customers. The CAA customers are the direct beneficiaries of these ISO services. It is from these CAA customers that PG&E seeks recovery in this GMC Pass-Through Tariff. PG&E does not seek to earn a return on the pass-through, but rather seeks to recover only the full cost it incurs on behalf of these third parties.

## 8. REQUESTED EFFECTIVE DATES AND BILLING PROCEDURES

### a. Effective Dates

Since the GMC Pass-Through Tariff is for new services, PG&E is requesting an effective date of January 1, 2001, which is the date the ISO requested their proposed new unbundled GMC Tariff (FERC Docket No. ER01-313-000) to become effective. If the Commission permits the ISO's filing to become effective on a different date, PG&E requests that this GMC Pass-Through Tariff permitted to become effective on the same date as the ISO GMC Tariff.

PG&E submits that the rate lock in PG&E Rate Schedule FERC No. 79 should not preclude a January 1, 2001, effective date, on the basis that this is a new service. If, however, the Commission determines that a new service is not being provided, and that the GMC Pass-Through Tariff is more appropriately considered an amendment of each of the existing CAAs, then PG&E requests that the GMC Pass-Through Tariff rates apply to all existing CAAs on the effective date of the ISO's GMC Tariff, except PG&E Rate Schedule FERC No. 79, to which the GMC Pass-Through Tariff rates apply as of April 1, 2001, when the rate lock provisions allow rate changes.

PG&E's request is prospective only. All of the costs are verifiable and represent a dollar for dollar recovery of what will be FERC-approved new unbundled ISO GMC tariff billings. Consequently, there can be no "excessive" recovery meriting any suspension. Moreover, if the Commission finds that the GMC Pass-Through Tariff constitutes a new service, a nominal suspension is appropriate because the West Texas rule does not apply in any event. *See Florida Power & Light Co.*, 65 FERC ¶ 61,411 at 63,128 (the Back Up Agreement does not constitute rate increase for purposes of the West Texas Utilities suspension analysis, but instead seeks compensation for a new service, albeit to existing customer").

**9. REQUEST FOR WAVIER**

The ISO made its filing of the unbundled GMC on November 1, 2000 in FERC Docket No. ER01-313-000. Upon receipt of that filing, PG&E is making this filing as expeditiously as possible.

PG&E respectfully requests that the Commission grant any waivers necessary to allow the new GMC Pass-Through Tariff (or the amendments to the existing CAAs) to take effect as of January 1, 2001, as or as otherwise requested herein. PG&E notes that the currently effective pass through GMC is set to expire on December 31, 2000 as established in the Commission's order in FERC Docket No. ER00-900-000, dated February 25, 2000.

**10. INFORMATION REQUIRED BY PART 35**

**a. List of Documents**

The following documents are being submitted with the GMC Pass-Through Tariff: a form of notice suitable for publication in the Federal Register; the GMC Pass-Through Tariff and attached appendices as Attachment 1; a redline of the superseded GMC Tariff as Attachment 2; the Direct Testimony of Shirley R. Eshbach as Attachment 3.

**b. Proposed Effective Date**

The proposed effective date for the GMC Pass-Through Tariff is described above.

**c. Persons To Whom Rate Filing Has Been Mailed**

This filing has been mailed, by first class mail postage pre-paid, to each CAA customer, as listed in the GMC Pass-Through Tariff, the ISO, and the California Public Utilities Commission.

**d. Brief Description of Rates and Cost Support Therefore**

The GMC Pass-Through Tariff rates are as described above and in the accompanying Direct Testimony of Shirley R. Eshbach. Period I and Period II data are not required for these rates, as the proposed rates and changes are based upon a pass-through of the ISO's proposed rates and changes resulting from its new unbundled ISO GMC tariff.

**e. Requisite Agreements**

No agreements are required for PG&E to file this Tariff.

**f. No Illegal, Duplicative of Unnecessary Costs**

None of the costs sought to be recovered have been adjudged illegal, duplicative or unnecessary costs that are demonstrably the product of discriminatory practices.

**g. Form of Notice**

Attached to this letter is a form of notice suitable for publication in the Federal Register with a 3.5" diskette version in WordPerfect 8.

**h. Service**

PG&E requests that the following persons be placed on the official service list for this proceeding:

Mark D. Patrizio
Keith T. Sampson
Attorneys
Pacific Gas and Electric Company
P.O. Box 7442
San Francisco, CA 94120
(415) 972-5646

Robert J. Doran
Manager, FERC Rates and Regulation
Pacific Gas and Electric Company
77 Beale Street, Room 1345, B13L
San Francisco, CA 94105-9612
(415) 973-6398

PG&E hereby submits an additional copy of the first page of this transmittal letter and respectfully requests that the Commission acknowledge receipt of this document by returning this copy endorsed as filed in the enclosed stamped, pre-addressed envelope.

Respectfully submitted,

MARK D. PATRIZIO
KEITH T. SAMPSON

By: ______________________
Keith T. Sampson

Attorneys for
Pacific Gas and Electric Company
Post Office Box 7442
San Francisco, California 94120
Telephone: (415) 972-5646

Attachments and Enclosures

# CERTIFICATE OF SERVICE

**CERTIFICATE OF SERVICE**

I hereby certify that I will cause to be served by courier or by First Class U.S. Mail, Pacific Gas and Electric Company's GMC Pass-Through Tariff and the related testimony upon all parties designated on the attached service list and the following:

Peter Arth, Jr.
General Counsel
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94103

Dated at San Francisco, California, this 9th day of November, 2000.

Joanne M. Myers

Joanne M. Myers

Pacific Gas and Electric Company
77 Beale Street, Room 1323 B13L
San Francisco, CA 94105
(415) 973–3397

Service List for GMC

Pacific Gas & Electric Company

| **Principal/Party Name/Address** | **Representative Name/Address** |
| --- | --- |
| Michael E.Werner<br>California Department of Water Resources<br>PO Box 942836<br>Sacramento, CA 94236-0001 | Elisa J Grammer Esquire<br>GKRSE<br>1500 K St NW Ste 330<br>Washington, DC 20005--1209 |
| Susan Weber, Chief Counsel<br>California Department of Water Resources<br>1416 9th St Rm 1104<br>Sacramento, CA 95814--5511 | Edna Walz, Deputy Attorney General<br>California Office of Attorney General<br>PO Box 944255<br>Sacramento, CA 94244--2550 |
| Roger E. Smith<br>California Independent System Oper. Corp<br>151 Blue Ravine Rd<br>Folsom, CA 95630-4704 | Edward Berlin, Esquire<br>Swidler Berlin Shereff Friedman, LLP<br>3000 K St NW Ste 300<br>Washington, DC 20007--5101 |
| | Joel D. Newton<br>Dynegy Power Services, Inc.<br>Suite 510-A<br>805 15th St NW<br>Washington, DC 20005--2207 |
| Roger Van Hoy Assistant General Manager<br>Modesto Irrigation District<br>PO Box 4060<br>Modesto, CA 95352—4060 | Wallace L Duncan Esquire<br>Duncan, Weinberg, Genzer & Pembroke, P.C<br>1615 M St NW Ste 800<br>Washington, DC 20036--3219 |
| George Fraser, General Manager<br>Northern California Power Agency<br>180 Cirby Way<br>Roseville, CA 95678--6420 | Robert C. McDiarmid, Esquire<br>Spiegel & McDiarmid<br>1350 New York Ave NW Ste 1100<br>Washington, DC 20005--4710 |
| Dana S. Appling, Esquire<br>Sacramento Municipal Utility District<br>PO Box 15830<br>Sacramento, CA 95852-1830 | Glen L. Ortman<br>Verner, Liipfert, Bernhard, et al.<br>SUITE 700<br>901 15th St NW<br>Washington, DC 20005-2327 |

Marco Gomez, Esq.
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
5TH FLOOR
800 Madison St.
Oakland, CA 94607-4730

Robert M. Westberg
PILLSBURY, MADISON & SUTRO
PO Box 7880
San Francisco, CA 94120-7880

Laurie Park, Manager
HETCH HETCHY WATER & POWER
4TH FLOOR
1155 Market St
San Francisco, CA 94103-1522

Dian M. Grueneich
GRUENEICH RESOURCE ADVOCATES
SUITE 1020
582 Market St
San Francisco, CA 94104-5301

SAN FRANCISCO CITY & COUNTY OF

Mary Ann Ralls
Duane, Morris & Heckscher
1667 K St NW Ste 700
Washington, DC 20006--1654

ROLAND D. PFEIFER
Silicon Valley Power
1500 Warburton Ave
Santa Clara, CA 95050-3713

Harrison Call
Call Company
PO Box 219
Cloverdale, CA 95425--0219

James H. Pope, Director
Silicon Valley Power
1500 Warburton Ave
Santa Clara, CA 95050--3713

James D. Pembroke, Esquire
Duncan, Weinberg, Genzer & Pembroke, P.C
1615 M St NW Ste 800
Washington, DC 20036--3219

Michael Brozo
Transmission Agency of Northern California
PO Box 15129
Sacramento, CA 95851-0129

Larry Weis, General Manager
Turlock Irrigation District
PO Box 949
Turlock, CA 95381-0949

Gregg D. Ottinger
Duncan & Allen
1575 I St NW Ste 300
Washington, DC 20005--1105

Koji Kawamura
Western Area Power Administration
PO Box 281213
Lakewood, CO 80228-8213

Debbie Dietz
Western Area Power Administration
114 Parkshore Dr
Folsom, CA 95630-4710

**NOTICE SUITABLE FOR**
**PUBLICATION IN THE FEDERAL REGISTER**

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Pacific Gas and Electric Company | ) ) ) | Docket No. ER01-________________ |

**NOTICE OF FILING**

(____________, 2000)

Take notice that on ________, 2000, Pacific Gas and Electric Company (PG&E) tendered for filing a new Grid Management Charge Pass-Through Tariff (GMC Pass-Through Tariff). This filing seeks to recover the costs proposed in the California Independent System Operator Corporation's (ISO) GMC filing in Docket No. ER01-313-000 on November 1, 2000.

PG&E requests an effective date of January 1, 2001 or the date the Commission makes effective the ISO's filing in Docket No. ER01-313-000.

Copies of this filing have been served upon the California Public Utilities Commission, all affected customers and the ISO.

Any person desiring to be heard or to protest said filing should file a motion to intervene or to protest with the Federal Energy Regulatory Commission, 888 First Street, N.E., Washington, DC 20426, in accordance with Rules 211 and 214 of the Commission's rules and regulations, 18 CFR §§ 385.211 and 385.214. All such motions or protests should be filed on or before ____________. Protests will be considered by the Commission in determining the appropriate action to be taken, but will not serve to make protestants parties to the proceeding. Any person wishing to become a party must file a motion to intervene. Copies of this filing are on file with the Commission and are available for public inspection. This filing may also be viewed on the Internet at http://www.ferc.fed.us/online/rims.htm (call 202-208-2222 for assistance).

David P. Boergers
Secretary

**Attachment 1**

**GMC PASS-THROUGH TARIFF**
**PG&E'S NEW TARIFF**

**(Clean)**

# PACIFIC GAS AND ELECTRIC COMPANY

## GMC PASS-THROUGH TARIFF

# GMC PASS-THROUGH TARIFF
## Table of Contents

I. BACKGROUND, DEFINITIONS AND SCOPE ..................... 2
1. Background. ........................................ 2
2. Definitions and Interpretation. .................. 2
3. Scope. ............................................ 5

II. CHARGES, BILLING AND PAYMENT ........................ 6
4. Charges Under GMC Pass-Through Tariff. ............ 6
5. Amendment to Control Area Agreements. ............. 7
6. Billing and Payments. ............................. 7

III. GENERAL PROVISIONS .................................. 9
7. Regulatory Filings. ............................... 9
8. No Expansion of Obligations. ...................... 9
9. Force Majeure and Indemnification. ............... 10
10. Creditworthiness. ............................... 11
11. Dispute Resolution Procedures. .................. 11
12. Waiver. ......................................... 12
13. Preservation of Obligations. .................... 12
14. Governing Law. .................................. 12
15. Appendices and Schedules Incorporated. .......... 13
16. Effective Date. ................................. 13

Appendix A - Control Area Agreement (CAA) Customers ...... 15

Schedule 1 ............................................. 17

# I. BACKGROUND, DEFINITIONS AND SCOPE

## 1. Background.

The purpose of this GMC Pass-Through Tariff is to provide a mechanism for recovery of the ISO's GMC charges to Pacific Gas and Electric Company ("PG&E"), by passing through those charges individually to each respective CAA Customer as defined herein. The ISO imposes GMC charges on PG&E as an SC, or through a designated SC on behalf of CAA Customers, under RPTO Agreements and the ISO Tariff. This Tariff sets forth the terms and conditions under which PG&E will pass-through the ISO's GMC costs billed to PG&E.

These ISO GMC costs include: (1) the Control Area Services Charge; (2) the Inter-Zonal Scheduling Charge; and (3) the Market Operations Charge, as those terms are detailed in the GMC provisions of the ISO Tariff filing in Docket No. ER01-313-000 on November 1, 2000.

## 2. Definitions and Interpretation.

**2.1. Master Definitions Supplement.** Unless defined in Section 2.2 of this Tariff, all terms and expressions used in this Tariff shall have the same meaning as those contained in the Master Definitions Supplement to the ISO Tariff.

2.2. **Special Definitions.** The following terms used in this Tariff are defined as set out below:

**"Commission"** means the Federal Energy Regulatory Commission.

**"Control Area Agreements"** ("CAA") means the existing wholesale contracts listed in Appendix A, entered into prior to commencement of ISO operations, under which PG&E provides certain ancillary services and other control area services.

**"CAA Customers"** means the customers listed in Appendix A of this Tariff, who are parties to the Control Area Agreements.

**"Effective Date"** means January 1, 2001, or any other date that the Commission permits this GMC Pass-Through Tariff to become effective. It is intended that this effective date be the same date that the Commission permits the ISO's unbundled GMC filing in Docket No. ER01-313-000, to be effective.

**"Party"** means PG&E and any CAA Customer or Other Party.

**"Responsible Participating Transmission Owner Agreement ("RPTO Agreement")"** means the agreement entitled "Responsible Participating Transmission Owner Agreement" between PG&E and the ISO dated December 10, 1997, as filed

in Docket No. ER98-1057-000, as amended from time to time.

**2.3. Rules of Interpretation.** The following rules of interpretation and conventions shall apply to this Tariff:

(a) If there are any inconsistencies between this Tariff and any other tariff or agreement to which PG&E and any CAA Customer listed in Appendix A are parties, this Tariff will prevail to the extent of the inconsistency;

(b) If there are any inconsistencies between this Tariff and the ISO Tariff or the TO Tariff, this Tariff will prevail to the extent of the inconsistency except as expressly provided otherwise in this Tariff;

(c) the singular shall include the plural and vice versa;

(d) "includes" or "including" shall mean "including without limitation";

(e) references to a Section, Article or Appendix shall mean a Section, an Article or an Appendix of this Tariff, as the case may be, unless the context otherwise requires;

(f) a reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented or restated through the date as of which such reference is made;

(g) unless the context otherwise requires, references to any law shall be deemed references to such law as it may be amended, replaced or restated from time to time;

(h) unless the context otherwise requires, any reference to a "person" includes any individual, partnership, firm, company, corporation, joint venture, trust, association, organization or other entity, in each case whether or not having separate legal personality;

(i) unless the context otherwise requires, any reference to a Party includes a reference to its permitted successors and assigns;

(j) any reference to a day, week, month or year is to a calendar day, week, month or year; and

(k) the captions and headings in this Tariff are inserted solely to facilitate reference and shall have no bearing upon the interpretation of any of the terms and conditions of this Tariff.

**3. Scope.**

**3.1. Pass-through of ISO GMC Costs.** This Tariff provides for the pass-through of all GMC costs incurred by PG&E on behalf of CAA Customers. This Tariff shall be interpreted broadly to allow PG&E to recover 100% of ISO GMC charged to PG&E under the terms of the ISO's filing in

Docket No. ER01-313-000. All such charges shall be paid by all CAA Customers. The pass-through, which is described in Section 4 and Schedule 1 of this Tariff, will be levied monthly on each CAA Customer beginning on the Effective Date.

**3.2. Customers under the Tariff.** This Tariff is mandatory for all CAA Customers. No other entities may take service under this Tariff.

## II. CHARGES, BILLING AND PAYMENT

### 4. Charges Under GMC Pass-Through Tariff.

Under this GMC Pass-Through Tariff, PG&E shall recover 100% of the GMC it incurs as SC. The GMC Pass-through amount is determined under the principles described in Sections 4.1 through 4.3, and Schedule 1 of this Tariff.

**4.1. Pass-through of Costs Actually Incurred.** The GMC Pass-through amount shall be a monthly charge on CAA Customers, that reflects the actual GMC costs and payment obligations incurred by PG&E.

**4.2. Allocation on the Same Basis as Allocated to PG&E.** The allocation formula for each of the ISO charge types is shown in the GMC provisions of the ISO Tariff filing in Docket No. ER01-313-000 and therein specifically in Schedule 1 of the ISO Tariff filing. The allocation of

the GMC to CAA Customers is shown on Schedule 1 to this Tariff, and shall, as much as practicable, be made on the same basis as the ISO allocates those costs to PG&E.

**4.3. Changes to GMC Pass-Through Tariff.** PG&E reserves the right to file unilateral amendments under Section 205 of the Federal Power Act to the GMC Pass-Through Tariff as necessary.

**5. Amendment to Control Area Agreements.**

To the extent necessary to allow PG&E to collect the ISO GMC Pass-Through Tariff costs from CAA Customers under this Tariff, this Tariff shall constitute an amendment to each CAA in order to allow PG&E to collect the GMC Pass-through, commencing on the Effective Date of this Tariff.

**6. Billing and Payments.**

**6.1. Billing and Payment.** PG&E as Participating Transmission Owner (PTO) shall submit an invoice to the CAA Customers on or after the last day of each billing period. Full payment of invoice shall be due upon delivery and must be received by PG&E no later than twenty (20) calendar days from the date of the invoice. All payments shall be made in immediately available funds payable to PG&E or by wire transfer to a bank named by PG&E.

**6.2. Interest on Unpaid Balances.** Interest on any unpaid amounts (including amounts placed in escrow) shall be calculated in accordance with the methodology specified for interest on refunds in the Commission's regulations at 18 C.F.R. Section 35.19a(a)(2)(iii). Interest on delinquent amounts shall be calculated from the date of the invoice to the date of payments. When payments are made by mail, invoices shall be considered as having been paid on the date of receipt by PG&E.

**6.3. Billing Disputes.** All payments shall be made in full without offset or reduction regardless of the existence of any dispute. A dispute between either the TO, CAA Customer and any Third Party shall not be a proper basis for contesting an invoice under this agreement.

**6.4. Customer Default.** Nonpayment of all or any part of a disputed invoice on or before the due date as described above, and in the event such failure of payment is not corrected within 30 calendar days after PG&E notifies the CAA Customer, to cure such failure, a default by the CAA Customer shall be deemed to exist. Upon the occurrence of a default, PG&E may initiate a proceeding with the Commission (or the Local Regulatory Authority for a Local Publicly Owned Electric Utility).

## III. GENERAL PROVISIONS

### 7. Regulatory Filings.

Nothing contained in this Tariff shall be construed as affecting in any way the right of PG&E to make unilateral application to the Commission for a change in rates, terms and conditions, charges, classification of service, Service Agreement, rule or regulation under Section 205 of the Federal Power Act and pursuant to the Commission's rules and regulations promulgated thereunder. Nothing contained in this Tariff shall be construed as affecting in any way the ability of any CAA Customer or other appropriate party to exercise its rights under the Federal Power Act and pursuant to the Commission's rules and regulations promulgated thereunder.

### 8. No Expansion of Obligations.

Nothing in this Tariff is intended to expand PG&E's obligations under the RPTO Agreement or the CAA nor to create new duties or obligations for PG&E. In addition, this Tariff is not intended to expand, or change in any way, scheduling protocols under CAA. This Tariff is explicitly not available to any new customer, or to any expansion of service to an existing CAA Customer.

9. **Force Majeure and Indemnification.**

9.1. **Force Majeure.** An event of Force Majeure means any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, any Curtailment, order, regulation or restriction imposed by governmental military or lawfully established civilian authorities, or any other cause beyond a Party's control. A Force Majeure event does not include an act of negligence or intentional wrongdoing. Neither PG&E nor the CAA Customer or other appropriate party will be considered in default as to any obligation under this Tariff if prevented from fulfilling the obligation due to an event of Force Majeure. However, a Party whose performance under this Tariff is hindered by an event of Force Majeure shall make all reasonable efforts to perform its obligations under this Tariff.

9.2. **Indemnification.** The CAA Customer or the other appropriate party shall at all times indemnify, defend, and save PG&E harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties,

arising out of or resulting from PG&E's performance of its obligations under this Tariff on behalf of the CAA Customer or other appropriate party, except in cases of negligence or intentional wrongdoing by PG&E.

10. **Creditworthiness.**

For the purpose of determining the ability of the CAA Customer or the other appropriate party to meet its obligations under this Tariff, PG&E may require reasonable credit review procedures. This review shall be made in accordance with standard commercial practices. In addition, PG&E may require the CAA Customer or the other appropriate party to provide and maintain in effect an unconditional and irrevocable letter of credit as security to meet its responsibilities and obligations under the Tariff, or an alternative form of security proposed by the CAA Customer or the other appropriate party and acceptable to PG&E and consistent with commercial practices established by the Uniform Commercial Code that protects PG&E against the risk of non-payment.

11. **Dispute Resolution Procedures.**

**11.1. ISO ADR Procedures.** As limited to the disputing parties, the ISO ADR Procedures set forth in the currently-effective Section 13 of the ISO Tariff shall apply to all disputes under this Tariff, except that those

procedures shall not apply to disputes as to whether rates and charges set forth in this Tariff are just and reasonable under the Federal Power Act.

**11.2. Rights under the Federal Power Act.** Nothing in this Section shall restrict the rights of any party to file a Complaint with the Commission under relevant provisions of the Federal Power Act.

**12. Waiver.**

Any waiver at any time by any Party of its rights with respect to any default under this Tariff, or with respect to any other matter arising in connection with this Tariff, shall not constitute or be deemed a waiver with respect to any subsequent default or other matter arising in connection with this Tariff. Any delay short of the statutory period of limitations in asserting or enforcing any right shall not constitute or be deemed a waiver.

**13. Preservation of Obligations.**

Upon termination of this Tariff, all unsatisfied obligations of each Party shall be preserved until satisfied.

**14. Governing Law.**

This Tariff shall be interpreted, governed by, and construed under the laws of the State of California, without

regard to the principles of conflict of laws thereof, or the laws of the United States, as applicable, as if executed and to be performed wholly within the State of California.

**15. Appendices and Schedules Incorporated.**

The Appendices and Schedules to this Tariff, as may be revised from time to time, are attached to this Tariff and are incorporated by reference as if fully set forth herein.

**16. Effective Date.**

The Effective Date of this Tariff shall be January 1, 2001, or whatever date the Commission accepts and makes effective the ISO's filing in Docket No. ER01-313-000.

# Appendix A

## CONTROL AREA AGREEMENT CUSTOMERS

## Appendix A
## Control Area Agreement (CAA) Customers

| CAA CUSTOMERS | CONTROL AREA AGREEMENTS |
|---|---|
| Bay Area Rapid Transit District | Service Agreement No. 42 under FERC Electric Tariff, First Revised Volume No. 3 (OAT) |
| Modesto Irrigation District | Interconnection Agreement—PG&E Rate Schedule FERC No. 116 |
| Northern California Power Agency | Interconnection Agreement—PG&E Rate Schedule FERC No. 142 Rev. |
| San Francisco (City and County of) | Interconnection Agreement—PG&E Rate Schedule FERC No. 114 |
| Silicon Valley Power (SVP) | Interconnection Agreement—PG&E Rate Schedule FERC No. 85 |
| Sacramento Municipal Utility District | Interconnection Agreement—PG&E Rate Schedule FERC No. 136 |
| Turlock Irrigation District | Interconnection Agreement—PG&E Rate Schedule FERC No. 213 |
| Western Area Power Administration (Western) | Integration Agreement—PG&E Rate Schedule FERC No. 79 |

**Schedule 1**

**PG&E'S
GMC PASS-THROUGH TARIFF**

**PG&E's
GMC Pass-Through Tariff
Schedule 1**

This Schedule 1 is designed to be consistent with Schedule 1 of the ISO filing in Docket No. ER01-313-000 filed on November 1, 2000. Calculation of the Monthly GMC Pass-Through Tariff Billing components for Control Area Agreement Customers based upon the three service charges included in the ISO's GMC, as follows:

1) The Control Area Services Charge for each CAA Customer is calculated as the product of the rate for the Control Area Services Charge and the CAA Customer's monthly Gross Load and exports.

2) The Inter-Zonal Scheduling Charge for each CAA Customer is calculated as the product of the rate for the Inter-Zonal Scheduling Charge and the absolute value of the net scheduled inter-zonal flow (excluding ETCs) per path for that CAA Customer.

3) The Market Operations Charge for each CAA Customer is calculated as the product of the rate for the Market Operations Charge and the CAA Customer's total purchases and sales of Ancillary Services, Supplemental Energy, and Imbalance Energy (both instructed and uninstructed).

**Attachment 2**

**PG&E'S SUPERSEDED GMC TARIFF**

**(Redlined)**

PG&E Tariff
Original Tariff Sheet No. 1

## ISO Grid Management Charge Pass-Through

PG&E's California Independent System Operator (ISO) Grid Management Charge (GMC) Pass-Through Tariff is designed to recover the ISO's GMC associated with the existing wholesale contracts for which PG&E serves as Scheduling Coordinator (SC) or energy provider. The ISO's Grid Management Charge is described in the ISO Tariff Sheets 186-188 and 374-380 also attached here.

The ISO GMC Pass-Through rate will be levied monthly in arrears on each of the existing wholesale contracts listed below for whom PG&E serves as SC or energy provider. The ISO GMC Pass-Through rate will be calculated and assessed in accord with Schedule 1 Part A of Appendix F of the ISO Tariff on each existing wholesale contract for energy transmitted over the ISO grid, including cases where PG&E has sold wholesale power through the California Power Exchange Corporation (PX) to PG&E's wholesale customers. The ISO's GMC is applied to such sales through billings to the PX. However, if any of these existing wholesale contract customers become recognized Scheduling Coordinators by the ISO, and pay all of their ISO Grid Management Charge Pass-Through or its equivalent directly to the ISO, PG&E will not charge any of those wholesale customers through this tariff.

PG&E will change the ISO Grid Management Charge Pass-Through to reflect changes that the ISO makes to its ISO Grid Management Charge. Any such future change to the current ISO Grid Management Charge Pass-Through Tariff will only be proposed to be made effective as a result of changes to the attached ISO Tariff Sheets or changes made pursuant to these existing attached ISO Tariff Sheets. Any proposed changes to this tariff must be filed by PG&E and made effective by FERC before being charged to any of PG&E's existing wholesale customers.

As to any future ISO filed or unfiled changes which change the ISO Grid Management Charge and result in a proposed PG&E rate change filing: 1) the PG&E filing will be made as promptly as possible; and 2) the proposed ISO Grid Management Charge Pass-Through rate will be the same rate as the ISO's proposed rate or the ISO rate accepted by FERC and will be made effective on the same date as the ISO's proposed rate or the day FERC makes the ISO's rate effective.

Existing PG&E wholesale customers who are subject to the ISO Grid Management Charge Pass-Through rate when transporting or wheeling power over the ISO controlled grid are as follows:

| PG&E Rate Schedule No. | Customer Name |
|---|---|
| 185 | Destec |
| 116 | Modesto Irrigation District |
| 142 | Northern California Power Agency |
| 186 | Power Exchange |
| 88 | Sacramento Municipal Utility District |

PG&E Tariff
Original Tariff Sheet No. 2

| PG&E Rate Schedule No. | Customer Name |
|---|---|
| 91 | Sacramento Municipal Utility District |
| 136 | Sacramento Municipal Utility District |
| 138 | Sacramento Municipal Utility District |
| 176 | Sacramento Municipal Utility District |
| 114 | San Francisco (City and County of) |
| 85 | Santa Clara (City of) (Interconnection only) |
| 72 | Sierra Pacific |
| 143 | Transmission Agency of Northern California[1] |
| 115 | Turlock Irrigation District |
| 126 | Western Area Power Administration |
| 147 | Western Area Power Administration |

**Open Access Transmission Tariff**

| Service Agreement | Customer |
|---|---|
| 42 and 43 | Bay Area Rapid Transit District (BART) |
| 1 | Minnesota Methane |

**Schedule 1**
**Grid Management Charge**
**Part A - Monthly Calculation of Grid Management Charge (GMC)**

The Grid Management Charge (ISO Tariff Section 8.0) is a formula rate designed to recover the ISO's administrative and operating costs, including costs incurred in establishing the ISO before its operations began. The Grid Management Charge also includes costs associated with Scheduling, System Control and Dispatch Service as described in Order No. 888.

The Grid Management Charge will be levied monthly in arrears on all Scheduling Coordinators by charging each Scheduling Coordinator the product of the Grid Management Charge rate, as calculated under Section 8.4 of the ISO Tariff, and the Monthly Metered Consumption, all as expressly set forth in the following formula; provided, however, that (i) Existing Contract Deliveries shall be multiplied by a factor of 0.5 before application of the GMC; (ii) loads in a given hour served by Other Volumes shall be exempt from the GMC; (iii) Qualified Loads shall be exempt from the GMC; and (iv) all New Uses, including those by Existing Contract Entities and QFs, are subject to the full GMC. The formula through December 31, 2000 is as follows:

$$\text{Monthly Bill}_{SCi} = [GMC \times (ECD_{SCi} \times 0.50)] + [GMC \times OMC_{SCi}]$$

1 Pass-Through of the ISO GMC is subject to the outcome of the hearing in Docket No. ER98-556-000.

Where:

| | | |
|---|---|---|
| SCi | = | the applicable Scheduling Coordinator |
| ECD | = | Existing Contract Deliveries |
| OMC | = | Other Metered Consumption |

For purposes of this Schedule 1, capitalized terms not included in the Master Definitions Supplement shall be defined as follows through December 31, 2000:

**Existing Contract Deliveries** shall mean scheduled deliveries or metered consumption under an Existing Contract to an Existing Contract Entity, calculated in MWh, in accordance with the method historically used by the parties to the Existing Contract.

**Existing Contract Entities** shall mean entities receiving energy under Existing Contract rights as defined in the ISO Tariff, as it exists on April 1, 1998.

**Monthly Metered Consumption** shall mean the aggregate of Other Metered Consumption and Existing Contract Deliveries.

**New Uses** shall mean volumes transported over the ISO Controlled Grid pursuant to an agreement that is not an Existing Contract under the ISO Tariff, and shall not include Qualified Loads.

**Other Metered Consumption** shall mean the sum of (i) total load of the Scheduling Coordinator within the ISO Control Area; (ii) total export of the Scheduling Coordinator outside of the ISO Control Area (including Wheeling Out and Wheeling Through the ISO Control Area); and (iii) but excluding Existing Contract Deliveries, Other Volumes and Qualified Loads. Other Metered Consumption includes New Uses.

**Other Volumes** for a given hour shall mean (i) the energy produced in that hour from any generating unit located within an Existing Contract Entity's service area or directly connected to transmission owned by such Existing Contract Entity and/or (ii) any volumes transported through a path that does not include facilities in the ISO Controlled Grid. Other Volumes does not include New Uses.

**Qualified Loads** means load served by QF energy that is generated on or distributed by the QF generator through private property or over distribution facilities that are dedicated to the QF through either an arrangement with the UDC in whose service territory the QF is located, or another entity that provides distribution level service, solely for its own use or the use of its tenants or two other corporations located on the real property on which the electricity is generated or on immediately adjacent real property and not for sale or transmission to others.

Section 8.5, which incorporates the difference between projected and actual costs from the previous year (such costs and adjustments being more specifically defined below in the Grid Management Charge Revenue Requirement Formula),

divided by:

- forecasted annual volume in MWh;

adjusted quarterly for:

- a change in the volume estimate used to calculate the Grid Management Charge if, on an annual basis, the change is 5% or more.

**The Grid Management Charge Revenue Requirement Formula is as follows:**

Grid Management Charge Revenue Requirement = Operating Expenses + Debt Service + the greater of [(Coverage Requirement x Senior Lien Debt Service) or (Cash Funded Capital Expenditures)] - Interest Earnings - Other Revenues - Reserve Transfer

Where,

**Operating Expenses** = O&M Expenses plus Taxes Other Than Income Taxes (Account 408.1) and Penalties (Account 426.3)

**O&M Expenses** = Transmission O&M Expenses (Accounts 560-574) plus Customer Accounting Expenses (Accounts 901-905) plus Customer Service and Informational Expenses (Accounts 906-910) plus Sales Expenses (Accounts 911-917) plus Administrative & General Expenses (Accounts 920-935)

**Penalties** = payments by the ISO for penalties or fines incurred for violation of WSCC reliability criteria (Account 426.3) that cannot be reasonably assigned and recovered pursuant to Section 2.5.26.5.

**Debt Service** = for any fiscal year, scheduled principal and interest payments, sinking fund payments related to balloon maturities, repayment of commercial paper notes, net payments required pursuant to a payment obligation, or payments due on any ISO notes. This amount includes the current year accrued principal and interest payments due April 15 of the following year.

**Coverage Requirement** = 25% of the Senior Lien Debt Service.

**Senior Lien Debt Service** = all Debt Service that has a first lien on ISO Net Operating Revenues (Account 128 subaccounts).

**Cash Funded Capital Expenditures** = Post current fiscal year capital additions (Accounts 301-399) funded on a pay-as-you-go basis.

**Interest Earnings** = Interest earnings on Operating and Capital Reserve balances (Account 419). Interest on bond or note proceeds specifically designated for capital projects or capitalized interest is excluded.

**Attachment No. 2**

**SECTION 8 OF ISO TARIFF**

**8. GRID MANAGEMENT CHARGE.**

**8.1 ISO's Obligations.**

**8.1.1 FERC's Uniform System of Accounts.**

The ISO shall maintain a set of financial statements and records in accordance with the FERC's Uniform System of Accounts.

**8.1.2 [Not Used]**

**8.2 Components of the Grid Management Charge.**

The formula adopted for setting the Grid Management Charge shall include the following components:

**8.2.1 Start Up and Development Costs.**

The ISO start up and development costs shall include an amortized amount standing to the credit of the ISO Memorandum Account plus any additional start up or development costs incurred after the date of Resolution E-3459 (July 17, 1996) plus any additional capital expenditure budgeted to be incurred by the ISO in 1998 ("Start Up and Development Costs"). The amortized amount to be included in the Grid Management Charge shall be equal to the amount necessary to fully amortize all Start Up and Development Costs over a period 5 years, or such longer period as the ISO Governing Board shall decide.

**8.2.2 Operating Costs.**

Budgeted annual operating costs, which shall include all staffing costs including remuneration of contractors and consultants, salaries, benefits and any incentive programs for employees, costs of operating, replacing and maintaining ISO systems,

lease payments on facilities necessary for the ISO to carry out its business, reasonable contingencies, and annual costs of financing the ISO's working capital("Operating Costs").

**8.2.3 Financing Costs.**

The other financing costs that are approved by the ISO Governing Board, including debt service on start-up costs and future capital expenditures. Capital expenditures may be financed over such period as the ISO Governing Board shall decide ("Financing Costs").

**8.2.4 Operating and Capital Reserves Cost.**

The budgeted annual cost of pay-as-you-go capital expenditures and reasonable coverage of debt service obligations. Such reserves shall be utilized to minimize the impact of any variance between forecast and actual costs throughout the year ("Operating and Capital Reserves Costs").

**8.3 Allocation of the Grid Management Charge Among Scheduling Coordinators.**

The Grid Management Charge shall be levied monthly in arrears on all Scheduling Coordinators by charging each Scheduling Coordinator the product of the Grid Management Change rate as calculated under Section 8.4, and the monthly metered consumption in MWh of energy (including Wheeling Out and Wheeling Through the ISO Controlled Grid) for that Scheduling Coordinator or by such other method as shall be approved by the ISO Governing Board and filed with FERC.

**8.4 Calculation and Adjustment of the Grid Management Charge.**

The Grid Management Charge shall be calculated by summing the Start-up and Development Costs, the Operating Costs, the Financing Costs and the Operating and Capital Cost Reserves Cost for each fiscal year. The sum of the calculation provided in this section shall be adjusted annually, or over such lesser period as approved by the ISO Governing Board and filed with the FERC, to reflect any variance between forecast and actual costs for the previous year or period, or the inability to recover from a Scheduling Coordinator its share of the Grid Management Charge, or any under-forecast of annual metered Demand for the previous year or period or any surplus revenues from the previous year or period as defined under Section 8.5. The result of the Grid Management Charge calculation, adjusted for variances as set out in this Section 8.4 shall then be divided by the forecast annual or periodic volume in MWh of Energy to establish a Grid Management Charge rate in $/MWh, which will be payable by Scheduling Coordinators as set out in Section 8.3.

**8.5 Operating and Reserve Account.**

Revenues collected to fund Operating Reserves shall be deposited in an Operating and Reserve Account until such account reaches a level specified by the ISO Governing Board. If the Operating and Reserve Account is fully funded, surplus revenues will be considered revenues in the next fiscal year's operating budget.

**Attachment No. 3**

**ISO TARIFF**
**SCHEDULE 1 OF APPENDIX F**

**ISO TARIFF APPENDIX F**

**Rate Schedules**

PG&E Tariff
Original Tariff Sheet No. 8

CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION
FERC ELECTRIC TARIFF
ORIGINAL VOLUME NO. I

First Revised Sheet No. 37[illegible]
Replacing Original Sheet No. [illegible]5

**Schedule 1**

**Grid Management Charge**

**Part A – Monthly Calculation of Grid Management Charge (GMC)**

The Grid Management Charge (ISO Tariff Section 8.0) is a formula rate designed to recover the ISO's administrative and operating costs, including costs incurred in establishing the ISO before its operations began. The Grid Management Charge also includes costs associated with Scheduling, System Control and Dispatch Service as described in Order No. 888.

The Grid Management Charge will be levied monthly in arrears on all Scheduling Coordinators by charging each Scheduling Coordinator the product of the Grid Management Charge rate, as calculated under section 8.4 of the ISO Tariff, and the Monthly Metered Consumption, all as expressly set forth in the following formula; provided, however, that (i) Existing Contract Deliveries shall be multiplied by a factor of 0.5 before application of the GMC; (ii) loads in a given hour served by Other Volumes shall be exempt from the GMC; (iii) Qualified Loads shall be exempt from the GMC; and (iv) all New Uses, including those by Existing Contract Entities and QFs, are subject to the full GMC. The formula through December 31, 2000, is as follows:

$$\text{Monthly Bill}_{SCi} = [\text{GMC} \times (\text{ECD}_{SCi} \times 0.50)] + [\text{GMC} \times \text{OMC}_{SCi}]$$

**Where:**

**SCi = the applicable Scheduling Coordinator**

**ECD = Existing Contract Deliveries**

**OMC = Other Metered Consumption**

For purposes of this Schedule 1, capitalized terms not included in the Master Definitions Supplement shall be defined as follows through December 31, 2000:

**Existing Contract Deliveries** shall mean scheduled deliveries or metered consumption under an Existing Contract to an Existing Contract Entity, calculated in MWh, in accordance with the method historically used by the parties to the Existing Contract.

**Existing Contract Entities** shall mean entities receiving energy under Existing Contract rights as defined in the ISO Tariff, as it exists on April 1, 1998.

**Monthly Metered Consumption** shall mean the aggregate of Other Metered Consumption and Existing Contract Deliveries.

Issued by: N. Beth Emery, General Counsel and Vice President
Issued on: June 24, 1999

Effective: July 1, 1999

**New Uses** shall mean volumes transported over the ISO Controlled Grid pursuant to an agreement that is not an Existing Contract under the ISO Tariff, and shall not include Qualified Loads.

**Other Metered Consumption** shall mean the sum of (i) total load of the Scheduling Coordinator within the ISO Control Area and (ii) total export of the Scheduling Coordinator outside of the ISO Control Area (including Wheeling Out and Wheeling Through the ISO Control Area); and (iii) but excluding Existing Contract Deliveries, Other Volumes and Qualified Loads. Other Metered Consumption includes New Uses.

**Other Volumes** for a given hour shall mean (i) the energy produced in that hour from any generating unit located within an Existing Contract Entity's service area or directly connected to transmission owned by such Existing Contract Entity and/or (ii) any volumes transported through a path that does not include facilities in the ISO Controlled Grid. Other Volumes does not include New Uses.

**Qualified Loads** means load served by QF energy that is generated on or distributed by the QF generator through private property or over distribution facilities that are dedicated to the QF through either an arrangement with the UDC in whose service territory the QF is located, or another entity that provides distribution level service, solely for its own use or the use of its tenants or two other corporations located on the real property on which the electricity is generated or on immediately adjacent real property and not for sale or transmission to others.

<u>Part B – Quarterly Adjustment, If Required</u>

The Grid Management Charge may change quarterly if the volume estimates, on an annual basis, change by 5% or more during the year. Each year the Grid Management Charge will be recalculated to reflect the following year's budget estimates and to adjust for any difference between the previous year's cost estimates and actual costs incurred.

<u>Part C – Components of the GMC</u>

As provided in Section 8 of the ISO Tariff, the Grid Management Charge includes the following costs:

- Operating costs (as defined in Section 8.2.2)
- Financing costs (as defined in Section 8.2.3), including Start-Up and Development Costs (as defined in Section 8.2.1)
- Operating and Capital Reserve costs (as defined in Section 8.2.4)

adjusted annually for:

- any surplus revenues from the previous year in the Operating and Capital Reserve Account, as defined under

Section 8.5, which incorporates the difference between projected and actual costs from the previous year (such costs and adjustments being more specifically defined below in the Grid Management Charge Revenue Requirement Formula);

divided by:

- forecasted annual volume in MWh;

adjusted quarterly for:

- a change in the volume estimate used to calculate the Grid Management Charge if, on an annual basis, the change is 5% or more.

**The Grid Management Charge Revenue Requirement Formula is as follows:**

Grid Management Charge Revenue Requirement = Operating Expenses + Debt Service + the greater of [(Coverage Requirement x Senior Lien Debt Service) or (Cash Funded Capital Expenditures)] - Interest Earnings - Other Revenues - Reserve Transfer

Where,

**Operating Expenses** = O&M Expenses plus Taxes Other Than Income Taxes (Account 408.1) and Penalties (Account 426.3)

**O&M Expenses** = Transmission O&M Expenses (Accounts 560-574) plus Customer Accounting Expenses (Accounts 901-905) plus Customer Service and Informational Expenses (Accounts 906-910) plus Sales Expenses (Accounts 911-917) plus Administrative & General Expenses (Accounts 920-935)

**Penalties** = payments by the ISO for penalties or fines incurred for violation of WSCC reliability criteria (Account 426.3)

**Debt Service** = for any fiscal year, scheduled principal and interest payments, sinking fund payments related to balloon maturities, repayment of commercial paper notes, net payments required pursuant to a payment obligation, or payments due on any ISO notes. This amount includes the current year accrued principal and interest payments due April 15 of the following year.

**Coverage Requirement** = 25% of the Senior Lien Debt Service.

**Senior Lien Debt Service** = all Debt Service that has a first lien on ISO Net Operating Revenues (Account 128 subaccounts).

**Cash Funded Capital Expenditures** = Post current fiscal year capital additions (Accounts 301-399) funded on a pay-as-you-go basis.

**Interest Earnings** = Interest earnings on Operating and Capital Reserve balances (Account 419). Interest on bond or note proceeds specifically designated for capital projects or capitalized interest is excluded.

**Other Revenues** = Amounts booked to Account 456 subaccounts. Such amounts will include connection fees associated with communications equipment and application fees.

**Reserve Transfer** = the projected reserve balance for December 31 of the prior year less the Reserve Requirement as adopted by the ISO Board and FERC. If such amount is negative, the amount may be divided by two so that the reserve is replenished within a two-year period. (Account 228 subaccounts)

**Reserve Requirement** = 15% of Annual Operating Expenses.

Part D – Information Requirements

Annual Filing

In accordance with the settlement reached in Docket No. ER98-211-000, beginning in 1999, the ISO will make an informational filing each year on December 15, or the first business day thereafter, which shall contain cost data on the ISO presented in conformance with the FERC Uniform System of Accounts (USA). This filing shall contain all information presented in the ISO's monthly financial report as provided in Paragraph 17 of the Offer of Settlement and such additional information as is required to set the GMC unit rate for the following calendar year, including the criteria used to set the projected volumes. To the extent that any party objects to such unit rate to be established, such party must file a complaint with the FERC under Section 206 of the Federal Power Act. Except as provided in Paragraph 7 of the Offer of Settlement, the Settlement will not be construed as barring a party's rights to seek or obtain relief under Section 206 of the FPA.

Monthly Financial reports

In accordance with the settlement reached in Docket No. ER98-211-000, the ISO will create monthly financial reports that present financial data both in the form created for the ISO Board of Governors and in a manner that conforms with the FERC USA, and shall include an explanation of how the data are converted from one format to the other. The monthly financial reports and the conversion explanation will be posted on the ISO's Website monthly.

Triennial Filing

Special procedures will be applicable to the informational filing used to establish the GMC unit rate for the year 2002, (*i.e.*, the informational filing to be submitted December 15, 2001) and each third year thereafter (triennial filings). The ISO will submit all the information required under 18 C.F.R. § 35.13, with the exception of pre-filed testimony, with such triennial filings. The ISO further will provide discovery on the triennial filings limited to requests for existing documents related to these filings. The ISO will accept requests for such documents through

the following January 8, in accordance with Paragraph 18 of the Settlement and will answer such requests by the following January 24. In accordance with Paragraph 18, parties may request a hearing by filing pleadings with the FERC by the following February 15 or by the date for filing such pleadings as set by the Commission. The ISO will inform the FERC of these procedures in its transmittal letter for the filing. If the FERC orders a hearing pursuant to such pleadings, then the ISO agrees that it will have the burden of proof on all questions set for hearing, except for the continued use of a 25 percent Coverage Requirement, the continued use of a 15 per cent Reserve Requirement, or the justness and reasonableness of its initial debt financing, as provided in Paragraph 7 of the Offer of Settlement. The Offer of Settlement shall not limit discovery rights otherwise available if a hearing is ordered.

**Part E** [Not used]

**Attachment 3**

**DIRECT TESTIMONY**
**SHIRLEY R. ESHBACH**

Ex. _____ (SRE-1)

# GRID MANAGEMENT CHARGE TARIFF

PREPARED DIRECT TESTIMONY

OF

SHIRLEY ESHBACH

ON BEHALF OF

PACIFIC GAS AND ELECTRIC COMPANY

# PREPARED DIRECT TESTIMONY
# OF
# SHIRLEY ESHBACH

Q 1 Please state your name and business address.

A 1 My name is Shirley R. Eshbach. My business address is Pacific Gas and Electric Company (PG&E), 77 Beale Street, San Francisco, California 94105.

Q 2 Please describe your current responsibilities with PG&E.

A 2 I am the Manager of the Transmission and ISO Contracts Section in the Electric Transmission Services Department. My section is primarily responsible for the management of PG&E's existing contracts with other utilities and governmental entities for interconnections and provision of wholesale transmission services and related services. My section is also responsible for managing the development and implementation of transmission and/or operations-related contracts between PG&E and the California Independent System Operator Corporation (ISO).

Q 3 Briefly describe your education and professional background.

A 3 I have a Bachelors degree in Mathematics from Portland State University. I joined PG&E in May 1997. Prior to coming to PG&E, I worked for 30 years at the Bonneville Power Administration in the fields of power marketing, regulation, and financial management. From 1983 through 1990, I had department-level responsibility for the development and administration of wholesale power and transmission contracts and rates. From 1990 through 1994, I was responsible for the agency's federal budget formulation and execution. From 1994 through

May 1997, I was the transmission cost and asset manager for the agency's transmission business unit.

I have previously submitted testimony before the Federal Energy Regulatory Commission (FERC or Commission) in Dockets Nos. ER00-2075-000 and ER00-565-000. I was also a witness in Bonneville Power Administration administrative rate proceedings in 1981, 1983 and 1985.

Q 4 What is the purpose of your testimony?

A 4 The purpose of my testimony is to: 1) provide an overview of the provisions of PG&E's new Grid Management Charge (GMC) Pass-Through Tariff; 2) explain the specific actions PG&E took with respect to the CAA customers to facilitate the startup of the new restructured California energy market; 3) describe the structure of the ISO's proposed unbundled GMC tariff; 4) provide background regarding PG&E's existing Control Area Agreements (CAA); and 5) request an effective date of January 1, 2001, or whatever other date FERC accepts or makes effective the ISO's filing in Docket No. ER01-313-000.

**I. GMC Pass-Through Tariff**

Q 5 What is the purpose of the new unbundled GMC Pass-Through Tariff filing?

A 5 The purpose of the new GMC Pass-Through Tariff is to set forth the terms and conditions under which PG&E will pass-through to the appropriate customers the actual amounts of GMC charges billed to PG&E either directly by the ISO or through a designated Scheduling Coordinator (SC).

Q 6 Please describe PG&E's current GMC Pass-Through Tariff.

A 6 On October 17, 1997, the ISO filed with FERC in Docket No. ER98-211-000 for recovery of its GMC. This ISO GMC was structured as a bundled rate to be recovered based upon volumes of energy transported. On October 30, 1997,

PG&E filed in Docket No. ER98-556-000 to recover the ISO GMC from all of its then existing transmission customers through its GMC Pass-Through Tariff. PG&E proposed to mirror the ISO GMC and pass-through on a dollar for dollar basis any GMC assessed to PG&E related to its then existing wholesale transmission contracts. The Commission accepted both filings and allowed the rates to go into effect subject to refund and hearing. On June 1, 1998, the Commission approved a non-precedential Settlement that covered not only Docket No. ER98-211-000, but also Docket No. ER98-556-000. The principal features of the non-precedential Settlement were: 1) it established the GMC rate for 1998 at $0.7831/MWh; 2) the ISO agreed to facilitate a study to unbundle the GMC; 3) existing wholesale transmission contracts were to be billed at 50% of metered consumption (or "volumes"); and 4) the GMC would be billed on net rather than gross loads. The Commission extended the Settlement through December 31, 2000. PG&E has been recovering the GMC through its GMC Pass-Through Tariff since April 1, 1998 in accordance with the FERC approved Settlement and its extensions.

Q 7 Does PG&E's new GMC Pass-Through Tariff differ from the tariff approved in the Settlement?

A 7 Yes, it does. The new GMC Pass-Through Tariff is based upon the ISO's new unbundled GMC proposal in Docket No. ER01-313-000 filed on November 1, 2000. The ISO proposes that the services it provides and the costs of providing those services should be allocated into three separate service charges: the Control Area Services Charge, the Inter-Zonal Scheduling Charge and the Market Operations Charge. Each of these ISO provided service categories is

explained in the ISO filing. PG&E proposes to pass-through the ISO GMC billed to PG&E to the appropriate CAA Customers.

Q 8 Why is PG&E proposing a new tariff at this time?

A 8 The current GMC Settlement will expire on December 31, 2000, and PG&E's current GMC Pass-Through Tariff will expire at the same time. Beginning on January 1, 2001, the ISO proposes to implement a new set of charges for recovery of its GMC. In order to assure PG&E's ability to recover 100% of the GMC, as billed to PG&E, starting on January 1, 2001, PG&E proposes the new GMC Pass-Through Tariff.

Q 9 Please explain how it is that PG&E incurs these GMC charges from the ISO.

A 9 PG&E acts as a Scheduling Coordinator (SC) for all but one of the CAA Customers. The ISO bills PG&E directly for these customers' GMC. The one exception is the Western Area Power Administration (Western) whose loads are scheduled through other designated SCs. However, all of these GMC charges are passed through to PG&E.

Q 10 Why is PG&E seeking recovery of the unbundled ISO GMC through this new GMC Pass-Through Tariff filing?

A 10 PG&E is proposing a new pass-through mechanism to accommodate the ISO's tariff filing in Docket No. ER01-313-000 on November 1, 2000. PG&E takes no position on the merits of the ISO's proposal in this filing. Given that the ISO GMC will only be billed by the ISO under FERC approved tariffs, the only question for this pass-through filing should be the appropriate allocation of these GMC costs to the appropriate CAA Customers benefiting from these services.

Q 11 Please describe how GMC costs are recovered under new PG&E GMC Pass-Through Tariff.

A 11 The GMC Pass-Through Tariff is designed to recover the GMC costs (incurred by PG&E on behalf of the CAA Customers) for a new set of control area services provided by the ISO. These new services allow CAA Customers to gain access to the ISO Control Area, and to allow these customers to obtain the benefits provided by that Control Area. Schedule 1 of the GMC Pass-Through Tariff sets forth the billing components based upon the three service charges included in the ISO's GMC.

**II California Restructuring/Establishment of ISO**

Q 12 Prior to the establishment of the ISO, how did PG&E's role differ from its role today?

A 12 At the time the CAAs were entered into, PG&E was the control area operator and owned an integrated utility system with generation, transmission and distribution assets. Today, PG&E is no longer the control area operator and has divested most of its generation resources as part of the industry restructuring in California. As a result, PG&E can no longer directly provide control area services to the CAA Customers.

Q 13 Please explain how the new market structure, including the establishment of the ISO, has affected the CAA Customers.

A 13 When the ISO went into operation on March 31, 1998, it became the control area operator for the combined prior control areas of PG&E, Southern California Edison Company (SCE) and San Diego Gas & Electric Company (SDG&E).

Q 14 Did the ISO impose any unique requirements on users of the ISO Controlled Grid?

A 14 Yes. The FERC-approved ISO Tariff sets forth the requirement that all schedules or uses of the ISO Grid must be submitted to the ISO by an ISO-certified SC. The SC responsibilities are set forth in Section 2.2 of the ISO Tariff and in the ISO Scheduling Protocol.

Q 15 How and why did PG&E become the SC for certain of the CAA Customers?

A 15 In the fall of 1997, when the target ISO startup date was January 1, 1998, the ISO attempted to establish operating agreements with the CAA Customers. These operating agreements would have provided a mechanism for these parties to continue to schedule their transmission transactions directly with the new control area operator, the ISO, after the startup of the ISO. After negotiations had been underway for some time, the ISO expressed a serious concern to PG&E that the negotiations would not be completed in time for ISO startup. The lack of such an operating agreement between the ISO and PG&E's CAA Customers would almost certainly have resulted in a delay in the ISO startup.

Q 16 What did PG&E do in the face of this potential delay?

A 16 In order to facilitate the start of the new market, PG&E and the ISO, along with SCE and SDG&E, developed and executed the Responsible Participating Transmission Owner Agreement (RPTO Agreement). Concurrent with executing the RPTO Agreement, PG&E also executed the SC Agreement with the ISO. Under that agreement, PG&E agreed to act as SC for the CAAs (except in Western's case, where PG&E designated an SC). As a result of the RPTO Agreement, PG&E and the ISO agreed that the CAA Customers could exercise their rights under their existing contracts with PG&E, as contemplated in Sections 2.4.3 and 2.4.4 of the ISO Tariff, notwithstanding any inconsistency

with other provisions of the ISO Tariff and the SC Agreement. By entering into the SC Agreement, PG&E became an ISO-certified SC.

Q 17 What is the principle objective in entering into the RPTO Agreement?

A 17 The principle objective of the RPTO Agreement is to grant the Responsible PTO exemptions from the ISO Tariff and Protocols and other ISO agreements that are necessary for the Responsible PTO to act as an SC for CAA Customers and thereby allow these entities access to the ISO-controlled grid, as contemplated in Sections 2.4.3 and 2.4.4 of the ISO Tariff. These exemptions are necessary because the CAAs in a number of instances do not give PG&E the information needed, or the authority to direct CAA Customers to take action as may be required to comply with the ISO's Tariff and Protocols.

Q 18 Does the RPTO Agreement address PG&E cost recovery of the ISO GMC that PG&E incurs as an SC or energy provider?

A 18 No. The RPTO does not specifically address the issue of the recovery of the ISO GMC that PG&E incurs on behalf of the CAA Customers.

Q 19 Has PG&E reserved the right under the RPTO Agreement to cease providing SC services to the CAA Customers?

A 19 Yes. RPTO Agreement Sections 2.3 and 2.6 provide for service to cease upon 20 days notice. Similarly, if the CAA Customers do not wish to pay PG&E for GMC charges under the ISO GMC Pass-Through Tariff rates, they remain free to act as their own SC or designate another SC and thereby take direct responsibility for any GMC incurred on their behalf.

## III. ISO Proposal in Docket No. ER01-313-000

Q 20 Please describe the structure of the ISO's proposed unbundled GMC tariff, which prompted PG&E to file its proposed new GMC Pass-Through Tariff.

A 20 The ISO GMC is being unbundled into three distinct service categories: 1) Control Area Services/Scheduling; 2) Inter-Zonal Scheduling; and 3) Market Operations / Billing and Settlements. In unbundling its GMC, the ISO separately developed the costs for the three service categories and also developed separate billing determinants for each.

Q 21 Could you be more specific regarding what the three components represent?

A 21 Yes. The ISO states the items listed below represent the various services provided to users of the ISO Control Area:

1) The Control Area Services category represents the ISO's costs, as the Control Area operator, of ensuring the safe, reliable operation of the transmission grid over the entire Control Area.

2) The Inter-Zonal Scheduling category includes the ISO's costs to operate the ISO Congestion Management process, including the Firm Transmission Right (FTR) auction, FTR monitoring, and FTR secondary market monitoring and scheduling.

3) The Market Operations / Billing and Settlements category includes the ISO's costs for market and settlement related services. Settlement services include the billing of, and payments for, energy, ancillary services capacity, and transmission service into, within and out of the ISO Control Area. Market operation services include providing open and non-discriminatory transmission access, conducting Ancillary Services auctions, providing an Energy balancing service, and similar services.

Q 22 Please explain why the services represented by the unbundled GMC, as you have described it, warrant PG&E's recovering those charges through its proposed ISO GMC Pass-Through Tariff.

A 22 PG&E acts as the conduit through which these services flow. PG&E takes information from the various CAA Customers, aggregates that information and passes it on to the ISO which performs the services requested and required by the CAA Customers. PG&E is billed under the ISO GMC for these services.

Q 23 You have described PG&E's GMC Pass-Through Tariff as being a new service. Would you tell us why this is so?

A 23 PG&E performing in the role of an SC for CAA Customers constitutes the provision of a new service. This new service comes about in a newly restructured industry and triggers the new charge. The range of new functions PG&E now performs on behalf of the CAA Customers includes preparing and submitting balanced schedules, procuring ancillary services and transmission losses under the ISO Tariff rules and protocols, paying new charges required by the ISO to schedule on the grid (e.g., neutrality and unaccounted for energy), and buying and selling energy in the ISO imbalance market for over and under deliveries. These are functions that were not previously performed or provided by PG&E under the CAAs. FERC's rule is that, unless a service is specifically prescribed by an existing contract, a public utility is not constrained by that contract from collecting the costs of any other service provided to that customer. "Contracts should be explicit as to the service provided. We will not infer an obligation to provide a service that is not explicitly required." Wisconsin Elec. Power Co., 46 FERC ¶ 61,019, at 61,111 n.7, reh'g denied, 48 FERC ¶ 61,247 (1989). A customer "is only given the right to receive the service which the contract provides." Id. For example, a contract providing firm transmission service does not, unless specifically stated in the contract, grant the customer nonfirm service rights, id., nor does it grant the customer the right to back-up

transmission service. See Florida Power & Light Co., 62 FERC ¶ 61,251 (1993), reh'g denied, 65 FERC ¶ 61,411, at 63,128 (1993) (treating filing as a new service and declining "to set for" hearing whether or not the existing contracts already provide for the [transmission] line backup services"). In this case, for all the reasons stated above, the GMC Pass-Through Tariff clearly represents a service that is fundamentally different than that provided under the CAA and, in any event, is not a service required by those agreements.

Q 24 Has the Commission previously approved an automatic flow-through of such costs?

A 24 Yes. The Commission has approved as discussed above the flow-through of the previous ISO GMC. This proposed new PG&E GMC Pass-Through Tariff is of the same nature in that it provides for customer-by-customer pass through of ISO GMC.

Q 25 Was the form of the recovery under these previous tariffs any different than what PG&E is now proposing, and if so please explain why PG&E is taking a different approach in its proposed GMC Pass-Through Tariff now?

A 25 Back in its October 30, 1997 filing, PG&E proposed to amend each CAA, but made it clear that "the ISO/GMC at issue in this filing is a new charge by a new entity for a new service." (See Transmittal Letter page 2). PG&E is now proposing that the Tariff be for a new service. PG&E believes that this latter approach is justified by a further analysis of what has happened in the restructured California electric industry. As I noted above, PG&E has had to undertake the role of an SC in order to provide access to the ISO grid to its CAA Customers, and in doing so has had to undertake duties and to assume responsibilities and obligations never contemplated let alone addressed in the

CAAs. The previous pass-through tariffs were predicated on the idea that the charges were associated with the provision of transmission service, but this is a far too limited view of what services the GMC represents. In reality, the ISO services being provided are for providing the CAA Customers access to the ISO Control Area and the benefits that this access provides.

## IV. PG&E's Control Area Agreements

Q 26 Please describe the nature of PG&E's CAAs.

A 26 Prior to the formation of the ISO, PG&E was the control area operator for Northern California. The CAAs were entered into with state and publicly-owned entities that were geographically and electrically located within the PG&E control area. Under these agreements, PG&E provided control area services from its own generation, and each of the control area services identified in the agreements was provided at cost-based rates. The CAAs were the agreements that governed the provision by PG&E of control area services to these customers.

Q 27 Please identify the CAA Customers to which the new unbundled GMC Pass-Through Tariff will apply.

A 27 The following are the CAA Customers affected by this new Tariff: Bay Area Rapid Transit District (BART), City and County of San Francisco (CCSF), Modesto Irrigation District (MID), Northern California Power Agency (NCPA), Sacramento Municipal Utility District (SMUD), Silicon Valley Power (SVP), Turlock Irrigation District (TID) and Western.

Q 28 In the event that the Commission determines that the GMC Pass-Through Tariff does not constitute a new service, does PG&E have an alternate proposal?

A 28 Yes.

Q 29 What is that proposal?

A 29 The Commission should accept the GMC Pass-Through Tariff as an amendment to each of the CAAs listed in Appendix A of the GMC Pass-Through Tariff. Each CAA contains a provision granting PG&E the unilateral right to file for rate changes under Section 205 of the Federal Power Act. Under the agreement with Western there is a rate lock until March 31, 2001, but PG&E submits that this rate lock is inapplicable because PG&E is now seeking recovery for providing a new service. Should the Commission determine that the new GMC Pass-Through Tariff does not constitute a new service, PG&E requests authority under the provision of PG&E Rate Schedule FERC No. 79 to commence billing Western its applicable share of the new GMC incurred by PG&E as of April 1, 2001.

## IV. Requested Effective Date

Q 30 What is the basis for PG&E requesting an effective date of January 1, 2001 for the new PG&E ISO GMC Pass-Through Tariff?

A 30 PG&E is requesting an effective date of January 1, 2001, or the date the ISO's proposed new unbundled GMC tariff proposal in Docket No. ER01-313-000 becomes effective. This request will ensure that there is a recovery mechanism in place with respect to GMC charges billed by the ISO to PG&E on behalf of the CAA Customers. All of the costs are verifiable and represent a dollar for dollar recovery of the FERC approved ISO GMC tariff billings. Consequently, there can be no "excessive" recovery meriting any suspension.

Q 31 Is any suspension period appropriate in this docket?

Q 31 No. All of the costs are verifiable and represent a dollar for dollar recovery of the FERC-approved ISO GMC tariff billings. Consequently, there can be no "excessive" recovery meriting any suspension.

Q 32 Does this conclude your testimony?

A 32 Yes, it does.

VERIFICATION

STATE OF CALIFORNIA )
) ss.
CITY AND COUNTY OF SAN FRANCISCO )

SHIRLEY R. ESHBACH, being first duly sworn, on oath, says that she is the SHIRLEY R. ESHBACH identified in the foregoing prepared direct testimony; that she caused to be prepared such testimony; that the answers appearing therein are true to the best of her knowledge and belief; and that if asked the questions appearing therein, her answers would, under oath, be the same.

Shirley R. Eshbach
SHIRLEY R. ESHBACH

Subscribed and sworn to before me
this 9th day of November 2000.

Marilyn G. Johnson-Cannon
Notary Public

MARILYN G. JOHNSON-CANNON
Commission # 1238845
Notary Public - California
Alameda County
My Comm. Expires Oct 19, 2003